# EXHIBIT 7



CERTIFIED TRUE COPY OF THE ORIGINAL

Wanangwa Hara LLB(Hons)
Notary Public
Commissioner for Oaths
Ritz Attorneys at Law
Box 60284, Blantyre 6, Malawi

**IN THE REPUBLIC OF MALAWI**

# IN THE MATTER OF AN ARBITRATION

**BETWEEN**

**MALAWI COMMUNICATIONS REGULATORY AUTHORITY (MACRA)**

**AND**

**AGILIS INTERNATIONAL INC**

## FINAL AWARD (CORRECTED)

### A. Background: The road to the hearing

1. These arbitration proceedings have been far from normal. The defendant did not participate in the hearing of these proceedings at all, and that is an understatement; the defendant simply did not participate in anything, pure and simple. On 5th October 2022, after a previous adjournment of the preliminary meeting, I issued an order on the preliminary hearing in the unexplained absence of the defendant and gave directions for the further conduct of these arbitration proceedings.

2. When I gave directions at the preliminary meeting, I made it clear that it was always left open for the defendant to decide to take part in the proceedings and, still, the defendant was a no show. The defendant did not submit a defence to the claimant's statement of case or submit anything at all.

3. I set out the reasons in the order of 5th October 2022 why I was satisfied that the defendant had been sufficiently served with the documents in these proceedings but purposefully decided not to take part in the proceedings. I will not hazard a guess as to

1

why the defendant would choose such a course of action. That would be neither helpful nor necessary.

4. The hearing of the proceedings took place on 7th March 2023, again after several postponements aimed at ensuring that the defendant was given due notice of the hearing and opportunity to take part in the proceedings. I satisfied myself that service on the defendant had taken place at their designated addresses both in the United States of America and in the Republic of South Africa. We set the hearing for 3 pm , CAT, in order to accommodate the defendant that's located in the United States of America. The reasoning was that, this way, should the defendant decide to take part in the hearing, its officers would find it fairly more convenient if we set the hearing for the afternoon, Malawi time, given the time differences between Malawi and the United States of America. Still the defendant did not turn up.

5. Having satisfied myself that the notice of hearing, the trial bundle and relevant documents had duly been brought to the defendant's attention, I allowed the hearing to take place on 7th March 2023.

## B. The Claimant's Claim

6. The Claimant, Malawi Communications Regulatory Authority (MACRA) delivered a statement of case dated 10th October, 2022. The claimant claims the sum of US$ 22,961,719, compound interest thereon at 10% above National Bank of Malawi's base lending rate, damages for breach of contract and for costs of the arbitration. The Claimant alleges that the defendant (an American company) breached contracts that it entered into with the Claimant beginning 2010 for the supply, installation and commissioning of a telecommunications monitoring system known as the consolidated ICT Regulatory Management System (CIRMS). The purpose of the CIRMS has been described as to facilitate the more effective regulation by the claimant of the telecommunications industry in Malawi, of which the Claimant is the regulator.

7. The defendant, as adverted to above, did not submit its defence and did not take part in the proceedings.

### C.   The Procedural rules

8. At the preliminary meeting, the Claimant, being the only party present, adopted the UNCITRAL Arbitration Rules, as revised in 2010, to be the procedural rules for the arbitration. Of particular importance, in the events that happened in these proceedings, is Article 30 (1)(b) 30(2) and 30(3). These provisions together provide for the continuation on to the hearing of arbitral proceedings in the absence of a respondent where, as here, they fail to deliver a defence or other documents within set times, without showing sufficient cause for such failure. Of further note is Article 30(1)(b) which provides that the respondent's failure to deliver its statement of defence should not be treated as an admission by the defendant of the Claimant's allegations. I have therefore proceeded on the basis that the defendant does not admit the claimant's claims in these proceedings.

### C. The Arbitration Agreement and Arbitrator appointment

9. The parties first entered into an agreement called the Master Services Agreement dated 21st May 2010 (apparently signed on 14th June 2010) with one another for the defendant to supply the CIRMS to the Claimant. The implementation of the agreement ran into problems when telecommunications operators in Malawi launched court challenges against implementation of the CIRMS.

10. The legal challenges were resolved in favour of the Claimant around 2015. However, by this time the CIRMS, in its initial structuring, had been overtaken by technological changes.   Consequently the parties agreed to upgrade the CIRMS and to that end entered into an amended agreement dated 13th March 2015 ("the Amended Agreement"). Further technological changes and passage of time necessitated further amendments. To that end, the parties entered into two addenda to the Amended

3

Agreement dated 29th March 2018 and 4th April 2018, respectively. The first Addendum revised the duration of the contract from 36 months to 72 months. The second Addendum recorded agreement to upgrade the CIRMS for compatibility with LTE/4G technology.

11. The parties further agreed on 16 February 2018 a Software Support Agreement for the more seamless implementation of the Amended Agreement.

12. Clause 8.7 of the Agreement, as amended, provides for Dispute Settlement. The clause provides for dispute resolution between the parties, initially by way of negotiations (clause 8.7 (a). If negotiations fail to resolve the dispute within 14 days of commencing negotiations, either party may refer the dispute to a single mediator to be appointed jointly by the parties, failing which, to be appointed by the President of the Malawi Law Society. If mediation does not resolve the dispute clause 8.7(c) entitles either party to refer the dispute, difference or question to a single arbitrator agreed upon by the parties and, failing agreement, to be appointed by the President of the Malawi Law Society.

13. I have satisfied myself that attempts were made by the parties to resolve their dispute or difference right down to mediation and that even though initially the defendant participated in the process through lawyers, Messrs Likongwe & Co.; the defendant's participation abruptly stopped. It appears that since then the defendant has not responded to any notices or communication. Further, it is evident that the defendant's previous lawyers discharged themselves from further representing the defendant during mediation because the defendant simply became non-responsive. The mediator consequently terminated the mediation.

14. In light of the failure of the mediation, I was appointed as arbitrator by the President (Chairman) of the Malawi Law Society (as provided for in the agreement of the parties) by letter dated 21st July, 2022 copied to me and addressed to the claimant and the defendant.

4

### D. The issues

15. The first issue is whether the defendant is in breach of contract as the Claimant contends.

16. The second issue is, if the defendant is in breach of contract, what remedies is the Claimant entitled to.

### E. The Evidence

17. The Claimant called the evidence of its Deputy Director of Legal Services, Dan Chiwoni. He joined the Claimant's employment in 2012. His evidence was that in 2010 MACRA entered into a contract with Agilis, the defendant, for the supply by Agilis of computer hardware and software. The equipment was supposed to deliver 4 functionalities to the Claimant for the Claimant's regulatory functions ie

    17.1   A revenue assurance functionality, to ensure that the claimant obtained firsthand information on international and local voice traffic flowing through the networks of Macra's licensed operators.

    17.2   The Quality of service (QoS) function by which Macra would monitor and ensure that licenced providers meet expected standards.

    17.3   The fraud management function, to allow Macra detect fraudulent activity on the networks of licenced telecoms operators.

    17.4   The spectrum management system; to allow Macra's system to analyse data from the frequency, monetary and management system viewpoints.

18. Daniel Chiwoni testified that of the 4 functionalities, the defendant supplied only one function; and that is the quality of services (QoS) functionality, and partial delivery of the Revenue Assurance functionality in that Macra was enabled to monitor

5

international, albeit not local, traffic. The rest of the functionalities were simply not delivered. The Claimant paid to the defendant the total sum of US$22,961,719; this sum was paid over a period of 10 years. I have set out Dan Chiwoni's evidence in Section C above regarding the various contracts that Macra and Agilis concluded. I do not repeat that evidence here.

19. The first Addendum to the Service Agreement was, as said above, dated 29th March 2018. Clause 1.1 and 1.2 of the first Addendum recited the fact that the first Addendum's purpose was to amend the Services Agreement of 13th March 2025 for the "supply, installation and implementation of the consolidated ICT regulatory management system (CIRMS)". Clause 3.3 thereof recorded that the contract price under the Services Agreement was a fixed sum of US$7,891,361 and by clause 3.5 thereof that Macra had since paid the contract Price in full" to Agilis.

20. Clause 3.6 recorded that Agilis had not performed all the Deliverables under the Services Agreement due to litigation by third parties. By clause 4.1 the duration of the Service Agreement was amended from 36 months to 72 months; calculated from 13th March 2015.

21. Daniel Chiwoni further testified that in April 2018 the parties entered into a second Addendum for the upgrade of the system in respect of which the Claimant paid US$1,100,000 (clause 5.1 thereof). In the same year the parties signed a Software Support Agreement for the duration of 3 years, and it was thereby agreed that Macra would pay US$1,400,000, in that regard, every year for the 3 years as maintenance and support services fees.

22. Daniel Chiwoni produced copies of correspondence exchanged between the parties; mostly from Macra cataloguing their misgivings about the defendant's lack of diligence with the implementation of the contracts. Such letters were exemplified by letters dated 23 January 2019, 13th November 2019, 17th January 2020 etc. The defendant responded

6

to some of the claimant's letters with its own and the most prominent one of them is the letter dated 5th April 2021.

23. Several points emerge from that letter from the defendant. First, the defendant denied that its agreement with the Claimant was for the supply specifically of 4 deliverables as asserted by the Claimant. The defendant agreed, however, by their letter that *"not all of the functionality of each of the deliverables have been activated, in most cases this can be activated in weeks not months"*.

24. Further, the defendant asserted in that letter that *"As for Agilis not meeting its contractual obligations this is correct, but in most cases where this is correct it is because Agilis did not and still does not have the data to move forward. As the vender (sic), Agilis cannot compel the operators or the MACRA vendors to give us the required data to implement various deliverables. Agilis has stipulated what data is required in each instance, then it becomes MACRA's responsibility to get the required data to Agilis. Agilis will indicate the specific times we requested information and the results of those requests. Once the data has been supplied, Agilis can activate the outstanding deliverables"*.

25. Further, by the said letter, Agilis agreed that MACRA had **"fulfilled its financial obligations up to this point"** [5 April, 2021] but indicated further that *"Agilis is prepared to activate the outstanding deliverables; a new timetable can be developed based on the delivery of the required data input"*. Agilis further asserted in that letter that the "Revenue Assurance application has been installed and is fully operational'. As particulars to that assertion Agilis indicated, in that letter that:

> *"(a) the local minute reporting needs to be configured with your team to determine what you would like to have in the local minute reporting.*
>
> *(b) international outgoing traffic monitoring can be configured and can be included in the next reporting cycle"* (para 3.2)

7

26. Further, Agilis stated in that letter that the *"NetMind fraud solution has been installed (since July 27, 2015 see the attached documents), it has not been configured and Agilis is ready to work with your team in the configuration of the fraud application. As for the Equipment Registry (EIR) report (this is not a separate application) this is report created by the Agilis Reporting Tool (ART). This requires data input with the manufacturer of each handset and the IMEI number. This data can be supplied by the operators. Once the data has been input into ART the registry will be created. MACRA must provide the data. Agilis last asked for this data in September of 2018"*.

27. Agilis further observed in that letter that the Software Support Agreement had lapsed as of February 16th, 2021 but that Agilis had *"continued to provide 24/7 support without payment for the past 7 weeks ... Now we are another (sic) crossroad, the CIRMS system is closer than you think to completion. Most of the outstanding deliverables require data or configuring, only probes are left to be installed. And as you and your team look for the best solution to move forward you are asking yourself, do I through (sic) this system out and start over? Do I choose a legal battle to recoup the MACRA investment?* ***Or do I see what is best deal I can make to protect MACRA's US$22m investment***" (Emphasis supplied).

28. Having set out the perceived quandary that MACRA's found itself in, the defendant's letter proceeded to say that *"Taking Agilis to court would do little to back up the invested dollars. Add that both Agilis and MACRA have (sic) are culpable when it comes to the delays in the deliverables in addition. Agilis and (sic) has been hit so hard with the COVID pandemic there would be little recourse even if MACRA managed to win an award against us"*.

29. In the final analysis by that letter, Agilis offered:

   a) Replacement of all hardware devices (and they would come with new warranties)

8

      b) Upgrade of all the software to the latest versions
      c) Implementation of all deliverables within 90 days of receipt of data
      d) Onsite Agilis personnel for 1 month

30. The conditions for achieving the proposal were set out by Agilis to include that the Claimant extends the maintenance agreement for 1 year for US$1.4m. This, according to the defendant's letter, would entail Macra having a brand new CIRMS system fully operational before 12 months, Macra would protect its US$22m investment, all functionalities would be implemented. Daniel Chiwoni testified that the claimant considered the defendant's proposal and rejected it. The rejection was contained in a letter from Macra dated 28th April 2021 responding to the Agilis letter of 5 April 2021. In that letter the claimant stated, among other things, that they found it unacceptable that the defendant having failed to carry out its part of the contract for three years, should turn around and ask Macra to grant it a further 12 months of contract and set a US41.4m payment condition. The claimant pointed out in that letter that Macra had *"dully (sic) honoured all is financial obligations on the contract and therefore it does not make much sense for Agilis to submit afresh payment claim as a prerequisite for it (Agilis) to finalise a task(s) which MACRA already paid for. Therefore MACRA perceives this commitment as not genuine and insincere as practically Agilis cannot have a ninety (90) day lead time for the remaining tasks when the same Agilis failed to deliver the tasks within the three (3) years contractual period"*.

31. By paragraph 6 of that letter Macra pointed out that it acknowledged *"that the hardware components might have ran their full cycle and are due for replacement [but] it should be highlighted that it is unfortunate that the equipment has been underutilized by the CIRMS system as Agilis only managed to enable a small portion of the functionalities despite having received full payment from MACRA on both contracts. Therefore, its replacement is supposed to be automatic and not to be attached to a new maintenance agreement fee of $1.4m"*.

32. Further, by letter dated 28 July 2021 Macra reiterated the proposal by Agilis for extension of the duration of the contract and advised that Macra's Board had rejected the proposal for further extension of the contract. Further, Macra, in that letter, notified the defendant that in the circumstances the dispute was due for mediation before a mediator to be appointed mutually by both parties pursuant to clause 7.3(b) of the Master Service Agreement. By a letter dated June 4, 2021 Agilis had indicated that in the absence of Macra paying the US$1.4m that they had asked for there was no path forward because to go forward Agilis would need input from third parties who would not act without payment.

33. Daniel Chiwoni testified that on the expiry of the duration of the agreement in March 2021 in view of the problem that Macra had had with the defendant, Macra decommissioned the system. He further refused to accept the assertion by the defendant that the revenue assurance application had been installed and was fully operational; saying instead that Macra could only monitor international traffic.

### F. Brief analysis of the facts

34. There is no doubt on the evidence from the claimant and from correspondence issued by the defendant that the parties entered into the agreements that the claimant has stipulated for in these proceedings. Further, there is no doubt that at the expiry of the duration of the agreement, the defendant had failed to implement some of the contractual deliverables. The correspondence from the defendant concedes that much. Further, there is no doubt that the claimant paid to the defendant the aggregate sum of US$22,961,719 as the claimant asserts. Some of the correspondence from the defendant that we have reviewed (in particular, the defendant's letter of 5th April 2021) concedes as much.

35. I considered whether the letter from the defendant of 5th April 2021 sets out a basis for supposing that the claimant caused the defendant's failure to carry out the terms of the contract fully. However, on close reflection, given the explanations given by the claimant to the defendant's assertions contained in correspondence, I am inclined to the view that the defendant simply exerted less effort to carry out the contract than it should have. The claimant depended on the defendant regarding the implementation of the technical aspects of the contracts and the defendant simply fell short of its contractual obligations to the claimant. In the circumstances, I find that the claimant has proved to the requisite standard that the defendant breached its contract with the claimant. I therefore find that the defendant committed breach of contract as contended by the claimant.

## G. Remedies

36. The claimant claims a refund of the sum of US$22,961,719 that it paid to the claimant, compound interest thereon at 10% above National Bank of Malawi base lending rate from the date of expiry of the contract (when full implementation of the CIRMS should have occurred) to the date of payment, damages for breach of contract and refund of mediation and arbitration fees and costs for mediation and arbitration.

37. The claimant cites the old English case of *Hadley v Baxendale (1854) 9 Exch 341* for the proposition that where two parties enter into a contract and one of them breaks it, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either as arising naturally from such breach of contract itself or such as may have been reasonably contemplated by both parties at the time they made the contract as a probable result of it. I accept this as a correct statement of a legal principle which has stood the test of time in the contract law in this country.

38. Further, I accept the correctness of the principle cited by counsel for the claimant at para 4.25 of the final written submissions, that the measure of damages for breach of contract is such as would put the innocent party in the position that he would have been had the contract not been breached. Counsel cites the old English case of *Livingstone v Rawyards Coal Co* (1880) 5 AC 25. This is probably expressed better in relation to breach of contract by saying that the purpose of damages for breach of contract is to place the plaintiff, so far as money can do, in the same position as he would have been in, had the contract been performed according to its terms (*Robinson v Harman [1848] 1 Exch 850*). This principle was enunciated in the Malawi Supreme Court Appeal case of *Saulos K. Chilima v Mike Appel & Gatto Ltd and Guava International Ltd MSCA Civil Appeal No. 211 of 2017* where the court stated:

> *"The common law restricts damages to losses suffered from breach of contract. Damages for breach of contract are not to penalize the wrongdoer. Damages, where money should aim, in contract just like in tort, for breach of duty of care to compensate for all losses following breach of a contract. For breach of contract, the injured party is "so far as money can do it, to be placed in the same situation with respect to damages as if the contract had been performed".*

39. With regard to the prayer that the defendant should be ordered to pay back to the claimant the sum of US$22,961,719 that the claimant paid to the defendant as the price for the contract, counsel for the claimant refers to the maxim *restituo in integrum* and cites the cases of *Livingstone v Rawyards and Saulos K. Chilima v Mike Appel & Gatto Ltd and Guava International Ltd*.

40. In the *Saulos K. Chilima v Mike Appel & Gatto Ltd and Guava International Ltd*, the plaintiff had bought a brand new Range Rover Sport HSE which the evidence showed that it was clearly of unmerchantable quality. The court ordered the defendant to supply to the plaintiff a brand new Range Rover Sport or an amount equivalent to the purchase price of such a vehicle at market value at the time of judgment.

41. The case of *Livingstone v Rawyards Coal* [1880] UK HL3 was really not a contract case; it was about determining damages payable to the plaintiff for a taking (albeit innocently) of a quantity of coal by the defendant from the plaintiff's land. Lord Blackburn made the oft-cited statement that:

> *"The point may be reduced to a small compass when you came to look at it. I do not think there is any difference of opinion as to its being a general rule that, where any injury is to be compensated by damages, in settling the sum of money to be given for reparation of damages you should as nearly as possible get at that sum of money which will put the party who has been injured, or who has suffered, in the same position as he would have been in **if he had not sustained the wrong** for which he is now getting his compensation or reparation"* (Emphasis supplied).

42. Counsel for the claimant, in submissions, refers as I say above, to the doctrine of *restituo in integrum* as justifying the submission that the claimant is entitled to a refund by the defendant of the sum of US$22,961,719 that the claimant paid to the defendant over the 10 years of the contractual relationship. *Restituo in integrum* is a well-established principle in the law governing compensation and its purpose (and purport) is "restitution to the original position".

43. This raises particular considerations in the law of contract where the "default" original position is the expectation that the contract will be performed according to its terms unlike in tort where the original position is where the wrong or injury has not been suffered. Contracts are meant to be performed but torts ought to be avoided. The performance of a contract by one party entails performance by the other party of their obligations. This is not to say that the principle of *restituo in integrum* is not applicable to contracts; on the contrary. However, in contract, *restituo in integrum* runs with rescission. The old English case of *Erlanger v New Sombrero Phosphate (1878) 3 App Cas 1218*, provides an example. Lord Blackburn said in that case:

13

> *"It is, I think clear on principles of general justice, that as a condition to a rescission there must be a restitution in integrum. The parties must be put in status quo. See per Lord Cranworth in Addie v The Western Bank. It is a doctrine which has often been acted upon both at law and in equity. But there is a considerable difference in the mode in which it is applied in Courts of Law and Equity, owing, I think to the difference of the machinery which the courts have at their command ...*
>
> *It would be obviously unjust that a person who has been in possession of property under the contract which he seeks to repudiate should be allowed to throw that back on the other party's hands without accounting for any benefit he may have derived from the use of the property, or if the property, though not destroyed has been in the interval deteriorated, without making compensation for that deterioration. But as a Court of Law has no machinery at its command for taking an account of such matters the defrauded party, if he sought his remedy at Law, must in such cases keep the property and sue in an action for deceit in which the jury, if properly directed, can do complete justice by giving as damages a full indemnity for all that the party has lost: see Clarke v Dixon, [E.B & E148] and the cases were cited".*

44. It has weighed heavily on my mind whether in the circumstances, the claimant is entitled to, in effect, a rescission of the contract, be put in its pre-contract original position and claim back the sum of US$22,961,719 that it paid to the defendant over the period of ten years. It appears to me that the case of *Saulos K Chilima v Mike Appel & Gatto and another is* distinguishable. In the circumstances of that case it would not have made much sense, or achieve justice, to say that the plaintiff must give to the defendant credit for the time that the plaintiff had had use of the car; that would have provided the plaintiff with, if money were paid rather than a brand new car substituted, an undesirable car that had not given the plaintiff his bargain right from the start.

14

45. In the present case the make-up of the US$22,961,719 is variable. Part of it relates to computer hardware that the defendant admittedly supplied to the claimant. Some of it related to periodically recurrent software maintenance fees. The claimant, in fact, says that of the four functionality deliverables, the defendant did actually deliver the quality-of-service functionality and thereby, presumably, enabled the claimant effective monitoring of the quality of its licencees' networks. Further, the claimant says that there was partial delivery of the revenue assurance functionality in that the claimant was able to monitor international voice traffic.

46. The problem it creates, in my view, is that it is not then possible for me to determine proportions; what is the proportional value of the functionalities that were delivered vis-a-vis the functionalities that were not delivered? Further, it appears that the annual maintenance fees were paid for actual "maintenance" albeit of a system that was less than contractually optimal. The bottom line therefore is that it would not deliver justice to unravel the whole contract rescission-style, and seek to proceed on the basis as though the contract had not been entered into at all. Doubtless, it cost the defendant money and other resources to supply those parts of the contracts that it did. It appears to me therefore that the more useful approach is to proceed with the time-tested purpose of damages for breach of contract as having the purpose of, in this case, putting the claimant in the position that it would have been in if the defendant had performed the contract according to its terms.

47. In practical terms this means that it should be possible for the claimant to demonstrate what, so far as money can do, would simulate the defendant performing the contract according to its terms. In other words, this is about placing a price on those aspects of the contract that the defendant did not perform and ordering the defendant to pay that sum. That, in my view, would more justly, place the claimant in the position that it would have been if the contracts had been performed according to their terms. I therefore order that the claimant should submit a witness statement within 14 days of the date hereof containing evidence tending to prove this requirement. Thereupon, I shall set a date on which the parties may be heard on such evidence. Article 27 (3) of

15

the UNCITRAL Arbitration Rules, as revised in 2010, allows me to require evidence of the nature that I require. In any event, this allows me to deal with this issue to a close.

48. The claimant further claims damages for breach of contract as a separate head. Given the foregoing discussion regarding the claim for the sum of US$22,961,719, it appears to me that once we deal with putting a price on the aspects of the contract that the defendant failed to deliver upon, we will have dealt sufficiently with the claimant's entitlement to damages for breach of contract.

49. It might have worked out easier if in view of the defendant's breach of contract, the claimant had treated the contract as repudiated and obtained a substitute service from a third party and claimed the cost of it from the defendant. But that is not what happened; and I will not go so far as to suggest that in mitigation of loss the claimant should have done so and incur considerable sums of money in expenses. In the upshot, I am not of the view that I should award a separate sum to the claimant for breach of contract at this stage as the claimant suggests. The claimant in final submissions urges me to award the sum of US$17m over and above US$22,961,719 as damages for breach of contract. Counsel says that this is 75% of the total cost paid by Macra to Agilis *"considering that AGILIS at least did supply equipment and software for one functionality (25%) of Quality of Service"*. I am of the view that this is too simplistic an approach for valuing damages for breach of contract. And, this can be dealt with better when the claimant proffers further evidence as I have directed above. I therefore do not award the sum of US$17m proposed by counsel for the claimant.

## H. Compound Interest

50. The claimant claims compound interest on the sum of US$22,961,719 on the basis that the claimant could have invested this money profitably elsewhere. In view of the decision above for further evidence on breach of contract, I will reserve deciding this question until we have ascertained the sum of damages for breach of contract.

16

### I. Costs

51. In the circumstances of this case and in line with Article 42(1) of the UNCITRAL Arbitration Rules, as revised in 2010, I am of the view that this is a proper case to order costs against the defendant and in favour of the claimant. For better economy, I direct that when we convene to receive the claimant's evidence on damages for breach of contract, the claimant should also proffer its calculation of the quantum of costs of the arbitration for my consideration and pronouncement upon a specific figure.

### J. FINAL AWARD

52. I therefore order as follows:

   a. The defendant is liable for breach of contract and the claimant is entitled to damages therefor. I so find.

   b. The claimant should hereafter proceed within 14 days hereof to submit and serve evidence on the calculation of damages for breach of contract for my consideration and pronouncement.

   c. The claimant is entitled to costs of the proceedings in respect both of the proceedings hitherto and in respect of the follow-up proceedings that I have directed.

   d. At the hearing of the claimant's evidence for breach of contract, the claimant shall further proffer its calculation of the quantum of costs of the arbitration for my assessment and pronouncement therein.

**Dated this 19th day of May, 2023**

*[signature]*

**PATRICE C. NKHONO, SC**
**ARBITRATOR**

17

**To:**  Messrs. Winlaw & Ndau
Legal Practitioners for the Claimant
P.O. Box 51824
**Limbe, Malawi**

The Chief Executive Officer
Agilis International Inc
1 Research Court, Suite 370 and/or 450
Rockville, MD 20850
**United Stated of America**

**Copy:**     The Managing Director/Chief Executive Officer
Agilis International Inc
2nd Floor West Tower
Nelson Mandela Square
Sandton, Johannesburg, 2196
**South Africa**